JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CORA BUCKLIN and VIRGINIA L. BURTON, individuals, on behalf of themselves, and on behalf of all persons similarly situated, | ) ) ) ) ) | 2:11-CV-05519-SVW-MRW **ORDER GRANTING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT [66][68] AND DENYING MOTION FOR CLASS CERTIFICATION [128]; AND JUDGMENT** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| AMERICAN ZURICH INSURANCE COMPANY, and Illinois Corporation, | ) ) ) ) | |
| Defendant. | ) ) | |

**I.   INTRODUCTION**

On March 21, 2011, Plaintiffs Cora Bucklin and Virginia Burton (collectively, "Plaintiffs") filed this putative class action against Defendant Zurich American Insurance Company ("Defendant"),[1] alleging wage and hour violations under the California Labor Code and the California Business & Professions Code.  Plaintiffs' Second Amended Complaint alleges four causes of action, all of which stem from Defendant's alleged failure to pay overtime and to provide meal and rest breaks: (1) unfair competition in violation of Cal. Bus. & Prof.

---

[1] Defendant was erroneously named in the Complaint as "American Zurich Insurance Company."  (See Dkt. 66 at 1).

Code § 17200 et seq.; (2) failure to pay overtime compensation in violation of Cal. Lab. Code §§ 510, 1194, 1198 et seq.; (3) failure to provide accurate itemized statements in violation of Cal. Lab. Code § 226; and (4) recovery of penalties under the Private Attorney General Act, Cal. Lab. Code § 2698 et seq. (Dkt. 62).

Now before the Court are Defendant's motions for summary judgment against each of the named Plaintiffs based on the affirmative defense that Plaintiffs were not entitled to overtime compensation or to meal and rest breaks because they were properly classified as exempt administrative employees. Plaintiffs subsequently filed a motion for class certification. For the reasons set forth below, Defendant's motions are GRANTED and Plaintiffs' motion for class certification is DENIED as MOOT.

**II.  FACTUAL BACKGROUND**

Defendant underwrites and adjusts insurance policies that cover workers' compensation. Plaintiffs worked as claims adjusters in Defendant's workers' compensation division, handling claims filed by injured employees of Defendant's clients. (Burton AMF ¶¶ 89-90). Plaintiffs both had the title of "Claims Specialist III," and both were classified as exempt from receiving overtime wages. (Burton AMF ¶¶ 1, 93; Bucklin AMF ¶¶ 1, 112).[2] Burton worked from November 2002 until April 2010, earning an annual salary ranging from $71,972 to $74,491, plus annual bonuses. (Burton AMF ¶¶ 1-2). Bucklin worked from April

---

[2] For ease, "Burton SUF" and "Burton AMF" refer to Defendant's statement of uncontroverted facts and Burton's statement of additional material facts, respectively, submitted in relation to the summary judgment motion against Burton. Meanwhile, "Bucklin SUF" and "Bucklin AMF" refer to the statements submitted with respect to the motion against Bucklin.

2005 until December 2010, earning between $75,762 to $78,413 each year, plus annual bonuses.  (Bucklin AMF ¶¶ 1-2).

During their employment, Burton maintained an average case load of approximately 150 to 175 claims, and Bucklin was responsible for between 100 to 171 claims.  (Burton AMF ¶ 11; Bucklin AMF ¶ 12). Plaintiffs handled their claims from inception until resolution. (Id.).  In doing so, Plaintiffs were required to follow the guidelines contained in Defendant's "Best Practices" manual and the California Labor Code.  (Burton AMF ¶¶ 101, 123-27; Bucklin AMF ¶¶ 120, 142-146; Bhowmik Decl. Exs. 1-4).  For example, the Best Practices instructed Plaintiffs to initiate contact with the claimant, the employer, any witnesses, and the medical provider.  (Burton AMF ¶ 12; Bucklin AMF ¶ 13).  At the same time, Plaintiffs also made their own decisions about which additional facts to investigate, which other witnesses to interview, and which methods to employ, including whether or not to obtain recorded statements from declarants.  (Burton AMF ¶ 13; Bucklin AMF ¶ 14; Bhowmik Decl. Exs. 1-4).  In addition, it is undisputed that Plaintiffs assessed witnesses' credibility and resolved conflicts in the evidence, including medical opinions.  (Burton AMF ¶ 14; Bucklin AMF ¶ 15).

Based on the facts discovered in the investigation, Plaintiffs determined whether the claim was covered and set reserves estimating the probable payout on the claim.  (Burton AMF ¶¶ 15, 19; Bucklin AMF ¶¶ 21, 27).  Plaintiffs also determined whether new developments regarding the claim required the reserves to be adjusted.  (Burton AMF ¶ 20; Bucklin AMF ¶ 28).  When setting reserves, Plaintiffs took into account a variety of factors, including the length of temporary

disability, the likelihood of permanent disability, and how disputes about these issues would likely be resolved in settlement or at trial. (Burton AMF ¶ 21; Bucklin AMF ¶ 29).  Although certain resources provided a range for the likely cost of treatment and length of disability, Plaintiffs evaluated medical reports and other evidence to select the appropriate figure within that range, or to determine whether adjustments were necessary.  (Burton AMF ¶¶ 22-25; Bucklin AMF ¶¶ 30-33).

For each claim, Plaintiffs developed a "plan of action" for moving the claim toward resolution.  Each plan was tailored to the facts of the case, identified objectives for resolving the claim and steps to achieve them – including identifying the issues in the case and the relevant time frames – and where appropriate, litigation strategies. (Burton AMF ¶¶ 42-44; Bucklin AMF ¶ 60-62; Bhowmik Decl. Exs. 1-4).  It is undisputed that each plan was developed by Plaintiffs without prior supervisor approval.  (Burton AMF ¶ 45; Bucklin AMF ¶ 64).  Meanwhile, as each case unfolded, Plaintiffs were responsible for flagging whether any facts suggested the potential for fraud, subrogation, or contribution from a third party.  (Burton AMF ¶ 28; Bucklin AMF ¶ 38).

For most of Burton's employment, she had authority to settle claims up to $75,000, set reserves up to $100,000 per claim, and authorize single payments up to $75,000 and aggregate payments up to $100,000 per claim.  (Burton AMF ¶ 54).  The aggregate payments that Burton authorized on her claims exceeded $500,000 annually, including benefits, settlements, and expenses.  During the last three years of her employment, the aggregate reserves on Burton's claim inventory typically exceeded $7 million.  (Id. ¶¶ 67-68).  For most of Bucklin's

4

employment, she had authority to settle claims up to $80,000, set reserves up to $100,000, and authorize single payments up to $50,000 and aggregate payments up to $250,000 per claim.[3]  (Bucklin AMF ¶ 78). The aggregate payments that Bucklin authorized on her claims exceeded $500,000 annually, and the aggregate reserves on her claim inventory typically exceeded $10 million.  (Id. ¶¶ 82-83).

When claims were litigated, Plaintiffs were responsible for determining whether to retain outside counsel and which attorney to hire, developing a litigation strategy with the attorney, and supervising the course of litigation, including deciding whether to conduct discovery and depositions or to seek expert opinions.  (Burton AMF ¶¶ 38-40; Bucklin AMF ¶ 53-54).  Although Defendant encouraged settlement and provided advice for conducting negotiations, Plaintiffs determined when to initiate settlement discussions based on several factors, including the evidence, a cost-benefit analysis, the insured client's priorities, and their caseload.  Plaintiffs further decided the appropriate settlement amount and conducted the negotiations, either directly with the claimant or through retained counsel.  (Burton AMF ¶¶ 46-47; Bucklin AMF ¶¶ 66-67; Bhowmik Decl. Exs. 1-4, 14).

Plaintiffs were supervised by Claims Managers.  (Burton AMF ¶ 130; Bucklin AMF ¶ 149).  Some of Plaintiffs' decisions required prior supervisor approval, including denials of compensability, hiring a private investigator, setting reserves or entering a settlement above their personal authority limits, retaining an attorney when the claimant was unrepresented, and referring claims to Defendant's

---

[3] Bucklin's authority limits decreased significantly – to a range of $7,500 to $10,000 – during the last month of her employment with Defendant.  (Bucklin SUF ¶ 78).

subrogation unit.  (Burton SUF ¶¶ 55-56; Bucklin SUF ¶¶ 35, 69).  When supervisory approval was needed, Plaintiffs would first formulate a rationale to support their analysis, and they would forward their reasoning and recommendation to their respective supervisor.  (Burton AMF ¶ 58; Bucklin AMF ¶¶ 35, 69).  Burton's supervisor approved her recommendations to hire an investigator approximately half of the time and almost always approved her other recommendations, occasionally requiring minor revisions or additional information before doing so.  (Burton AMF ¶ 59).  Bucklin's supervisor almost always approved her recommendations for setting reserves or settling a claim beyond her authority.  (Bucklin AMF ¶¶ 35, 69).  Plaintiffs' supervisors also (1) reviewed their handling of their claims at 12, 60, and 180 day intervals after a claim was assigned; (2) audited two open files and two closed files each quarter for compliance with Defendant's expectations; and (3) performed other informal, periodic reviews of Plaintiffs' work, including checking to be sure that required deadlines were met and that required communications were made.  (Burton SUF ¶¶ 64, 66; Burton AMF ¶¶ 141-42; Bucklin SUF ¶¶ 79, 81; Bucklin AMF ¶¶ 160-61).

With respect to some claims, Plaintiffs were also required to adhere to special handling instructions imposed by Defendant's insured clients, including seeking approval before taking certain actions on a claim.  (Burton SUF ¶ 62; Burton AMF ¶ 121-22; Bucklin SUF ¶ 17-18, 26, 37; Bucklin AMF ¶¶ 140-41).  When approval was necessary, Plaintiffs would submit recommendations to the insureds along with their reasoning.  The insureds almost always accepted Plaintiffs' recommendations.  (Burton AMF ¶ 63; Bucklin AMF ¶¶ 19, 26, 37).

**III. LEGAL STANDARD**

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Tarin v. County of Los Angeles, 123 F.3d 1259, 1263 (9th Cir.1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000) (internal quotations and citations omitted). However, if the moving party does not bear the burden of proof, it can satisfy its Rule 56(c) burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. Either way, if the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts – by affidavits or as otherwise provided in the rule – that show a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine only "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 248.  "Conclusory allegations unsupported by factual data cannot defeat summary judgment." <u>Rivera v. Nat'l R.R. Passenger Corp.</u>, 331 F.3d 1074, 1078 (9th Cir. 2003).  Thus, the Ninth Circuit has "refused to find a genuine issue where the only evidence presented is uncorroborated and self-serving testimony." <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002) (internal quotation marks omitted).

## IV.  DISCUSSION

The parties agree that Plaintiffs' claims must fail if Plaintiffs were exempt from the overtime and break requirements under California law.  (<u>See</u> Burton Opp. at 22; Bucklin Opp. at 22).  Defendant bears the burden of proving Plaintiffs were properly classified as exempt workers.  <u>Ramirez v. Yosemite Water Co., Inc.</u>, 978 P.2d 2, 8 (Cal. 1999).  For the reasons set forth below, the Court concludes that Defendant has met this burden and is entitled to summary judgment.

### A.  Administrative Exemption[4]

California Industrial Welfare Commission ("IWC") Wage Order 4-2001 applied at all relevant times to Plaintiffs' employment with Defendant.

---

[4]  In considering whether Plaintiffs are administratively exempt, the Court rejects the testimony of Plaintiffs' retained expert, David Pilcher, for two reasons.  First, Plaintiffs did not disclose Pilcher pursuant to Rule 26.  (Decker Supp. Decl. ¶ 3).  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless."  Fed. R. Civ. P. 37.  Plaintiffs have not explained their failure to disclose Pilcher, and their failure has prejudiced Defendants, who have not been able to depose Pilcher.  Second, Pilcher's declaration is not signed under penalty of perjury.  Therefore, it is ineligible for consideration pursuant to Fed. R. Civ. P. 56(e).

See California Wage Order 4-2001, codified as 8 Cal. Code Regs. § 11040; Harris v. Super. Ct. (Harris I), 266 P.3d 953, 956 n.1 (Cal. 2011) (analyzing exempt treatment of claims adjusters employed after October 1, 2000 under Wage Order 4-2001).[5]  Wage Order 4-2001 made "persons employed in administrative . . . capacities" exempt from California's overtime and meal and rest period requirements.  8 Cal. Code Regs. §§ 11040.1.(A)(2), 11040.3, 11040.11, 11040.12.

Employees fall within the administrative exemption from these laws if: (1) their duties and responsibilities involve the performance of office or non-manual work "directly related" to the management policies or general business operations of their employer or their employer's customers; (2) they "customarily and regularly exercise discretion and independent judgment;" (3) they "perform under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge;" (4) they are "primarily engaged" in duties meeting the test of exemption; and (5) they earn a monthly salary at least two times the state minimum wage for full-time employment.  8 Cal. Code Regs. § 11040.1.(A)(2).  Further, the administrative exemption extends to "all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions."  Id. § 1.(A)(2)(f).

Additionally, Wage Order 4-2001 states that "[t]he activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations

---

[5]  California Labor Code § 510 requires that employees be paid overtime for any work in excess of eight hours per day or in excess of forty hours in one week.  Section 515 of the Labor Code authorizes the Industrial Welfare Commission ("IWC") to establish exemptions from this overtime requirement for certain employees.

under the Fair Labor Standards Act effective as of the date of this order:  29 C.F.R. Sections 541.201-205, 541.207-208, 541.210, and 541.215."  <u>Id.</u>  In other words, in applying Wage Order 4-2001, "just as the [labor] statute is understood in light of the wage order, the wage order is construed in light of the incorporated federal regulations."  <u>Harris I</u>, 266 P.3d at 958.[6]  Thus, the "precise question here is whether plaintiffs' work as claims adjusters is encompassed" by the administrative exemption as construed in accordance with the relevant statute, wage orders, and federal regulations.  <u>Id.</u> at 958.

Here, Plaintiffs do not dispute that their duties involved office or non-manual work, 8 Cal. Code Regs. § 11040.1.(A)(2)(a)(I), or that they earned more than twice the state minimum wage for full time employment, <u>id.</u> § 11040.1.(A)(2)(g).  (Burton AMF ¶ 4; Bucklin AMF ¶ 4).  Rather, the dispute centers around the remaining elements of the administrative exemption.  The Court therefore turns to the first element, whether Plaintiffs' work was "directly related" to the management policies or general business operations of Defendant.

### 1.   "Directly Related" Requirement

In <u>Harris I</u>, the California Supreme Court clarified that the phrase "directly related" was defined by the incorporated federal regulation located at 29 C.F.R. § 541.205 (2000).[7]  To be "directly

---

[6] With respect to the Wage Order 4-2001, the IWC separately issued a statement indicating that it "deems *only* those federal regulations *specifically* cited in its wage orders, and in effect at the time of promulgation of these wage orders, to apply in defining exempt duties under California law."  <u>Harris I</u>, 266 P.3d at 180 (emphasis added).

[7] Title 29 C.F.R. § 541.205 (2000) states, in pertinent part:

> (a)   The phrase "directly related to management policies or general business operations of his employer or his employer's customers" describes those types of activities

10

related" to management policies or general business operations, the

court explained, an employee's work must be both "qualitatively

administrative" and "quantitatively . . . of substantial importance to

the management or operations of the business." Harris I, 266 P.3d at

959.  The administrative exemption inquiry is fact-specific, and thus

"courts must consider the particular facts before them and apply the

language of the statutes and wage orders at issue." Id. at 965.  With

this in mind, the Court examines the qualitative and quantitative

factors separately below.

_____

relating to the administrative operations of a business as
distinguished from "production" or, in a retail or service
establishment, "sales" work. In addition to describing the
types of activities, the phrase limits the exemption to
persons who perform work of substantial importance to the
management or operation of the business of his employer or
his employer's customers.

(b)   The administrative operations of the business include the
work performed by so-called white-collar employees engaged
in "servicing" a business as, for example, advising the
management, planning, negotiating, representing the
company, purchasing, promoting sales, and business research
and control. An employee performing such work is engaged in
activities relating to the administrative operations of the
business notwithstanding that he is employed as an
administrative assistant to an executive in the production
department of the business.

(c)   As used to describe work of substantial importance to the
management or operation of the business, the phrase
"directly related to management policies or general
business operations" is not limited to persons who
participate in the formulation of management policies or in
the operation of the business as a whole. Employees whose
work is "directly related" to management policies or to
general business operations include those work affects
policy or whose responsibility it is to execute or carry it
out. The phrase also includes a wide variety of persons who
either carry out major assignments in conducting the
operations of the business, or whose work affects business
operations to a substantial degree, even though their
assignments are tasks related to the operation of a
particular segment of the business.

*i.   Qualitative Component*

The qualitative prong asks whether an employee's duties constitute "those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work."  29 C.F.R. § 541.205(a).  The "administrative operations of a business" may "include work done by 'white collar' employees engaged in servicing a business.  Such servicing may include, as potentially relevant here, advising management, planning, negotiating, and representing the company." Harris I, 266 P.3d at 960 (citing 29 C.F.R. § 205(b) (2000)).

Several courts have held that the duties of claims adjusters such as Plaintiffs constitute "servicing" a business because they involve evaluating claims and representing Defendant in negotiating and settling claims.  In Palacio v. Progressive Ins. Co., 244 F. Supp. 2d 1040, 1047 (C.D. Cal. 2002), the court reasoned that "an employee who negotiates with clients and settles damage claims on behalf of an employer engages in duties consistent with the servicing of a business" under 29 C.F.R. 541.205(b) (2000).  Thus, the court held that a claims adjuster met the qualitative test because she (1) "regularly and continually represented [the insurer] during negotiations with attorneys and claimants," (2) "had absolute authority to settle within her limits, which included approximately ten percent of her cases," and (3) "regularly advised management regarding claims handling and related matters." Palacio, 244 F. Supp. at 1047.  See also Cheatham v. Allstate Ins. Co., 465 F.3d 578, 585 (5th Cir. 2006) (holding that under section 541.205(b), claims adjusters' duties were "administrative in nature" because they "advised the management, represented [the

insurer], and negotiated on [the insurer's] behalf")[8]; <u>Jastremski v. Safeco Ins. Co.</u>, 243 F. Supp. 2d 743, 751 (N.D. Ohio 2003) (reasoning that claims representative's duties were administrative in nature where he "advised management of his findings on insurance claims, planned how to handle insurance claims, and negotiated binding settlements with claimants while representing the company").

Given the analogous facts in this case, the Court concludes that Plaintiffs' duties satisfy the qualitative prong of the "directly related" test.  Here, as in the cases above, Plaintiffs "serviced" Defendant's business by "advising management, planning, negotiating, and representing the company."  <u>Harris I</u>, 266 P.3d at 960.  The uncontroverted facts establish that Plaintiffs (1) planned the processing of their claims; (2) represented Defendant in investigating claims, determining coverage, and setting reserves; (3) managed litigation and negotiated settlements on behalf of Defendant; and (4) where necessary, made recommendations to their supervisors (which frequently were accepted).  (Burton AMF ¶¶ 12, 38-40, 42-43, 46, 54, 58-59; Bucklin AMF ¶¶ 13, 35, 53-54, 60-61, 66, 78, 69).  Thus, the foregoing tasks were directly related in a qualitative sense to the administrative operations of Defendant's business.

Plaintiffs object on three grounds, none of which are availing.  First, Plaintiffs protest that Defendant's reading of "servicing" is overly broad because it would exempt any employee who represents his or her employer.  (Burton Opp. at 16).  As a cautionary example,

---

[8] Plaintiffs object that <u>Cheatham</u> is inapposite because it interpreted the 2004 version of 29 C.F.R. § 541.205(b), instead of the 2000 version at issue here.  <u>Cheatham</u> remains instructive, however, because the text of the 2004 version is identical to the 2000 version.

Plaintiffs cite Rieve v. Coventry Health Care, Inc., 870 F. Supp. 2d 856 (C.D. Cal. 2012), in which the defendant argued that its employee, a nurse case manager, was exempt because she "represented" the company when she interacted with the public. Id. at 873. The court held that the nurse case manager was not exempt by virtue of the fact that she "attempted to provide her employer with a positive public image." Id. The court reasoned that "a cashier at a fast food restaurant represents his employer, as a bank teller represents his bank," yet the regulations are clear that such employees are not exempt. Id. (citing 29 C.F.R. § 541.205(c)(1) (stating that bank tellers are not exempt)).

Rieve is distinguishable, however, because Plaintiffs' work is significantly different from the role of a fast food cashier or a bank teller, or even the nurse case manager found to be non-exempt in Rieve. In that case, the court emphasized that even though the nurse could "make recommendations and advise patients, . . . ultimately the decisions about patient care are made by the physician and the claims adjustors. . . . Defendants have presented no evidence that Plaintiff can take affirmative action that would bind anyone other than herself." 870 F. Supp. 2d at 874-75. Here, by contrast, it is undisputed that Plaintiffs had the authority to make certain binding, affirmative decisions on behalf of Defendant without obtaining supervisory approval, including setting reserves and negotiating settlements within their personal authority limits, issuing payments, and making litigation decisions. Therefore, Plaintiffs genuinely engaged in "servicing" Defendant's business.

Second, Plaintiffs argue that Palacio, Jastremski, and Cheatham are unworthy of reliance inasmuch as they rely on the argument that

claims adjusters are exempt because they do not "produce" their employers' product—i.e., insurance policies—but rather provide ancillary services.  In short, Plaintiffs contend that these cases improperly rely on the "administrative/production dichotomy," an approach Plaintiffs assert was "condemned" in Harris I.  Plaintiffs misunderstand Harris I.  Harris I expressly stated: "We do *not* hold that the administrative/production worker dichotomy . . . can never be used as an analytical tool.  We merely hold that the Court of Appeal improperly applied the administrative/production worker dichotomy as a dispositive test."  266 P.3d at 965 (emphasis added).  While it is true that the above-cited cases employ the administrative/production dichotomy as an analytical tool to evaluate whether the claims adjusters' work was "directly related" to administrative operations, they did not rely on this logic exclusively.  Rather, the cases also examined whether the adjusters' duties "serviced" their employers' businesses within the meaning of section 541.205(b).  See Palacio, 244 F. Supp. 2d at 1046-47; Jastremski, 243 F. Supp. 2d at 751; Cheatham, 465 F.3d at 585.  Thus, the cases did not err in the way Plaintiffs claim.

     Third, Plaintiffs urge the Court to follow the reasoning of the California Court of Appeals in Harris v. Superior Court (Harris II), 144 Cal. Rptr. 3d 289, 306 (Ct. App. 2012), which was decided on remand from the California Supreme Court's decision in Harris I.  In Harris II, as here, the plaintiffs were insurance claims adjusters who planned the claims process, represented and bound the insurer in negotiating settlements, and advised management about potential subrogation or fraud issues.  Id. at 299.  Nonetheless, the state appellate court

concluded that the plaintiffs' duties did not satisfy the qualitative prong because none of their work was "carried on at the level of management policy or general operations," but rather was part of the "day-to-day operation of Employers' business." Id. at 298. The court rejected the argument that plaintiffs "serviced" the insurer's business by representing the company, negotiating on its behalf, and planning the claims process. Id. at 299-300. The court reasoned that although some forms of representation, negotiation, and planning constitute "servicing," some do not. It concluded that "[b]ecause Employers make no attempt to specify where the line should be drawn, let alone to show that Adjusters' work falls on the proper side, their argument fails." Id. at 301.

This Court declines to follow Harris II for three reasons. First, the Harris II court invented its own test to determine whether the claims adjusters' activities were administrative in character. Specifically, the court required that claims adjusters' activities occur "at the level of management policy or general operations" to qualify as administratively exempt. Id. at 298. That articulation, however, is a "judicially created" gloss that was invalidated in Harris I on the ground that it failed to give full effect to the governing federal regulations. Harris I, 266 P.3d at 963-64. As Harris I teaches, "Federal Regulations former part 541.205(a), (b), and (c) must be read together in order to apply the 'directly related' test and properly determine whether the work at issue satisfies the administrative exemption." Id. at 964. Section 541.205(a) provides that the phrase "directly related to management policies or general business operations of his employer" describes those activities

"relating to the administrative operations of a business."  In turn, section 541.205(b) explains that the phrase "administrative operations of a business" includes work performed by "employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, [and] representing the company . . . ."  Nothing in this text suggests that the activities must occur at the level of management or general operations.  Indeed, section 541.205(c) makes it unmistakably clear that the phrase "'directly related to management policies or general business operations' is *not limited* to persons who participate in the formulation of management policies or in the operation of the business as a whole."  29 C.F.R. § 541.205(c) (emphasis added).  Read together, these regulations lend no support to the contrived requirement in <u>Harris II</u> that an employee must work "at the level of management policy or general operations" to satisfy the qualitative prong of the "directly related" standard.[9]

Second, and in any event, the decision in <u>Harris II</u> was depublished by the California Supreme Court, which means it has no precedential value among California courts and, perhaps more importantly, suggests that the California Supreme Court would not adopt

---

[9] <u>Harris II</u> attempts to blunt the force of section 541.205(c) by arguing that it only applies to the quantitative prong of the "directly related" test – i.e., whether the adjuster's work is of "substantial importance" to business operations.  Nonetheless, <u>Harris I</u> instructs that the regulations must "be read as a whole" and as such, "interpretations are to be avoided if they render part of an enactment nugatory."  266 P.3d at 964.  Here, adopting <u>Harris II</u>'s invented "policy level" test would render pointless the caveat in section 541.205(c) that work need not occur at the policy level to meet the quantitative prong.  Stated differently, if the only activities that could satisfy the "directly related" test were limited to those that occur at the policy level, such a reading in effect would render meaningless the caveat in section 541.205(c).

its reasoning.   Third, the Harris II court's facile refrain that not *all* forms of representation, negotiation, and planning constitute "servicing" a business is unhelpful, since defining which types of representation, negotiation, and planning constitute "servicing" is a question of law for the courts to elucidate.[10]   Here, for the reasons described earlier, the Court concludes that Plaintiffs have satisfied the qualitative prong of the "directly related" test because their activities as claims adjusters serviced the business operations of Defendant.

*ii.   Quantitative Component*

The quantitative prong holds that an administrative employee's duties are "directly related" to management policies or general business operations only if they are of "substantial importance to the management or operation of the business of his employer or his employer's customers."   29 C.F.R. § 541.205(a); Harris I, 266 P.3d at 959.   To satisfy this test, an employee need not "participate in the formulation of management policies or in the operation of the business as a whole."   29 C.F.R. 541.205(c); see also Harris I, 266 P.3d at 960 (stating that section 541.205(c) governs the quantitative component).   Rather, employees whose work is "of substantial importance" to the

---

[10]   To bolster its point, the Harris II court compares the claims adjusters to legal secretaries.   The court explained that although a legal secretary might "negotiate" with couriers about filing documents, or "advise" a partner that a filing should not be "planned" for a certain day, such work is not "directly related to management policies or general business operations."   Id.   True enough, but the court's logic is in fact an application of the quantitative prong of the "directly related" test, which requires that the work performed be of "substantial importance" to the management or operation of the business.   Here, the Court concludes that the adjusters' work was both administrative in nature and substantially important to its business operations.

management or operations of a business also includes those whose "work affects policy or whose responsibility it is to execute or carry it out. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business." 29 C.F.R. § 541.205(c). Instructively, the regulation specifically identifies "claim agents and adjusters" as an example of the kind of employee who meets the quantitative component. 29 C.F.R. § 541.205(c)(5).

Here, Plaintiffs' work substantially affected Defendant's business with respect to the setting of reserves and settlements. First, it is undisputed that Plaintiffs had independent authority to set reserves up to $100,000 per claim, and thus handled claims with aggregate reserves of $7-10 million. (Burton AMF ¶¶ 54, 67-68; Bucklin AMF ¶¶ 78, 82-83). Defendant or its insureds were required to set aside funds to satisfy these reserves, which funds were then unavailable for other purposes. (Burton AMF ¶¶ 68-69; Bucklin AMF ¶¶ 83-84). It is undisputed that Plaintiffs' decisions regarding the reserve amount carried consequences for Defendant's business: setting reserves too low could cause Defendant to violate regulatory requirements, while setting reserves too high could deprive Defendant or its clients of funds needed for other purposes. (Burton AMF ¶¶ 70-71; Bucklin AMF ¶¶ 85-86). Second, it is uncontroverted that Plaintiffs had independent authority to settle claims up to $75,000-$80,000 and to authorize single payments up to $50,000-75,000. As a result, the aggregate payments that Plaintiffs authorized on their claims—for benefits, expenses, and settlements—

exceeded $500,000 annually.  (Burton AMF ¶¶ 67-68; Bucklin AMF ¶¶ 82-
83).[11]  Moreover, when a proposed settlement exceeded their personal
authority limits, Plaintiffs furnished recommendations to their
supervisors, which were generally accepted.  (Burton AMF ¶¶ 58-59;
Bucklin AMF ¶¶ 35, 69).  Thus, the uncontroverted facts illustrate that
Plaintiffs' contributions affected Defendant's business to a
substantial degree.  Indeed, courts have held that adjusters perform
work "of substantial importance" even when adjusting or settling
relatively smaller claims.  See Roe-Midgett v. CC Servs., Inc., 512
F.3d 865, 871 (7th Cir. 2008) (large percentage of claims under
$10,000); Jastremski, 243 F. Supp. 2d at 746, 755 (adjuster had
authority to determine coverage, set reserves, and settle claims up to
$15,000).[12]

                           *    *    *

    In sum, the Court concludes that Plaintiffs' work was "directly
related" to the management policies or general business operations of
Defendant.  8 Cal. Code Regs. § 11040(1)(A)(2).  Though not strictly
necessary to the Court's analysis, two additional authorities bolster
the Court's conclusion.  First, the Ninth Circuit has recognized that
insurance claims adjusters who perform substantially the same
duties as Plaintiffs are administratively exempt.  See In re Farmers

---

[11] So great was Burton's influence that one of Defendant's clients
expressed that it would only maintain its policy with Defendant if
Burton were assigned to handle claims under the policy.  (Burton SUF
¶ 73).

[12] Accordingly, the fact that Bucklin's payment authority limits
decreased during her last month of employment does not vitiate the
substantial importance of her work, which also included setting
reserves and managing litigation.

_Ins. Exchange, Claims Representatives' Overtime Pay Litigation_, 481 F.3d 1119, 1129 (9th Cir. 2007).  In _Farmers_, the Ninth Circuit relied on a new regulation published by the Department of Labor in April 2004, which states:

> Insurance claims adjusters generally meet the duties requirements for the administrative exemption, whether they work for an insurance company or other type of company, if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation.

29 C.F.R. § 541.203(a).  The Ninth Circuit noted that the district court's factual findings "almost track word for word the language of § 541.203."  481 F.3d at 1129.  In particular, the district court found that the plaintiffs' duties included determining whether the policy covered the loss, recommending a reserve after estimating the employer's exposure according to state law, interviewing the insured and assessing witness credibility, advising the employer regarding fraud or subrogation, negotiating settlements, seeking authority from supervisors when settlement recommendations exceeded the adjustors' authority (which was granted more than 75 percent of the time), and communicating with litigation counsel.  _Id._  Because these duties fell within section 541.203(a), the Ninth Circuit concluded that the claims adjusters were exempt from the FLSA.  _Id._

Plaintiffs contend that _Farmers_ is inapplicable here because the Court may rely only on those existing federal regulations cited in Wage Order 4-2001, not later revisions such as above-cited section 541.203. On one hand, it is true that "[t]he IWC Statement issued in connection

with Wage Order 4-2001 clearly states that 'only those federal
regulations specifically cited in its wage orders, and in effect at the
time of promulgation' shall be applied in defining exempt duties under
California law." Harris I, 266 P.3d at 965. Nevertheless, Harris I
also recognized that Farmers remains "instructive because the
regulations enacted by the United States Department of Labor after Wage
Order 4-2001 were intended to be consistent with the old regulations."
Id. at 964 n.8. Thus, "when the DOL promulgated § 541.203, it said
that the new regulation 'is consistent with existing section
541.205(c)(5).'" Farmers, 481 F.3d at 1128 (quoting 69 Fed. Reg.
22122, 22144 (April 23, 2004)). Section 541.205(c)(5), as already
noted, specifically enumerates claims adjusters as an example of
employees who satisfy the quantitative test. Because sections 541.203
and 541.205(c) are congruous, it stands to reason that any employee who
meets the criteria of section 541.203 also satisfies the quantitative
prong under former section 541.205(c). Thus, because Plaintiffs
performed all the duties described in section 541.203, they also
satisfy the quantitative component under former section 541.205(c).

    Second, even if Farmers does not apply, the Court, in interpreting
federal regulations, "must give deference to the Department of Labor's
interpretation of its own regulations through, for example, Opinion
Letters." Farmers, 481 F.3d at 1129. On November 19, 2002, the
Administrator of the Wage and Hour Division issued an opinion letter
that applied former 29 C.F.R. § 541.205 to conclude that insurance
claims adjusters perform work that meets the "directly related" test
and is therefore administrative in character. DOL Wage & Hour Div. Op.

22

Ltr. (Nov. 19, 2002), Daily Lab. Rep. (BNA), Nov. 20, 2002.[13]   The

letter observed that "Wage and Hour has long recognized that claims

adjusters typically perform work that is administrative in nature."

Id. at 2.   Notably, the duties of the claims adjusters at issue in the

DOL letter substantially mirrored the duties of Plaintiffs:

> They are responsible for planning the processing of
> a claim from the beginning to the end, whether it is
> easily and quickly resolved or whether it proceeds to
> litigation. They represent the company and advise the
> management throughout the process of gathering the
> evidence, assessing credibility, reviewing the
> insurance policy, determining whether there is
> coverage, evaluating liability, making a decision on
> whether and how much to pay on the claim,
> establishing a reserve for the case, making a
> recommendation on claims above their established
> authority, and collaborating with the company's
> counsel if the case results in litigation. They also
> negotiate on behalf of the company with the claimant,
> whether the claimant is a policyholder or a
> third-party claimant. Because these duties involve
> servicing the insurance company in the same manner
> that claims adjusters traditionally have done so, as
> is reflected in the regulatory reference to claims
> adjusters, we find that their duties are
> administrative in nature.

Id.   The Ninth Circuit in Farmers acknowledged that the DOL's foregoing

position with respect to claims adjusters has been consistent over the

years and that its reasoning was persuasive.   481 F.3d at 1119.   This

Court follows Farmers in concluding that the Opinion Letter is

persuasive authority that is entitled to deference.   See Christensen v.

Harris County, 529 U.S. 576, 587 (2000) ("[I]nterpretations . . . such

as opinion letters are entitled to respect . . . to the extent that

those interpretations have the power to persuade." (internal quotations

---

[13]   Available at:
http://www.dol.gov/whd/opinion/FLSA/2002/2002_11_19_11_FLSA.pdf.   The
FLSA grants the Secretary of Labor broad authority to "define and
delimit" the scope of the exemption for executive, administrative,
and professional employees.   29 U.S.C. § 213(a)(1).

and citation omitted)).   That the promulgating agency has consistently

held that the duties of claims adjusters such as Plaintiffs are

administrative in nature pursuant to the then-applicable federal

regulations, bolsters the Court's conclusion that Plaintiffs satisfy

the "directly related" element of Wage Order 4-2001.

> 2.   Customarily and Regularly Exercised Discretion and
> Independent Judgment

The Court next examines whether Plaintiffs customarily and

regularly exercised discretion and independent judgment.   The "exercise

of discretion and independent judgment involves the comparison and the

evaluation of possible courses of conduct and acting or making a

decision after the various possibilities have been considered."   29

C.F.R. § 541.207(a) (2000).   The phrase "implies that the person has

the authority or power to make an independent choice, free from

immediate direction or supervision and with respect to matters of

significance."   Id.

In Cheatham, the Fifth Circuit affirmed the district court's

decision holding that a group of claims adjusters satisfied section

541.207(a) where they "exercised discretion in determining coverage,

conducting investigations, determining liability and assigning

percentages of fault to parties, evaluating bodily injuries,

negotiating a final settlement, setting and adjusting reserves based

upon a preliminary evaluation of the case, investigating issues that

relate to coverage and determining the steps necessary to complete a

coverage investigation, and determining whether coverage should be

approved or denied."   465 F.3d at 586.   Although the adjusters had to

seek approval in certain situations, the court ruled that their

"recommendations for action" still involved discretion and judgment

because they were expected to make a recommendation based on their experience and knowledge of the case and to explain their reasons for recommendation.  Id. at 585-86.  Accord McAllister v. Transamerica Occidental Life Ins. Co., 325 F.3d 997, 1001 (8th Cir. 2003) (claims adjuster exercised discretion and independent judgment in directing claim investigations, deciding whether to pursue fraudulent claims, approving contestable claims up to $150,000 and inconstestable claims up to $250,000, disbursing payments up to $50,000, and applying contract and insurance law to facts); Roe-Midgett, 512 F.3d at 873-75 (auto claims adjusters exercised discretion and independent judgment in distinguishing covered damage from fraudulent or preexisting damage, deciding what parts to replace instead of repair, negotiating cost of repairs with body shops, and settling claims up to $12,000 personal authority limit without supervision).

There is ample uncontroverted evidence that Plaintiffs routinely used their discretion and independent judgment to make choices that impacted "matters of significance."  In investigating claims, Plaintiffs decided whether to interview witnesses or gather facts beyond the required minimum, assessed witnesses' credibility, and resolved conflicts in the evidence.  (Burton AMF ¶¶ 13-14; Bucklin AMF ¶¶ 14-15).  In determining coverage, Plaintiffs applied their knowledge of the relevant law to the facts of the case.  (Burton AMF ¶ 16; Bucklin AMF ¶ 22).  In addition, for each claim, Plaintiffs had to decide whether any facts pointed to the possibility of fraud, subrogation, or contribution from a third party, and if so, whether to refer the claim to Defendant's fraud, subrogation, or underwriting units.  (Burton AMF ¶¶ 28-29; Bucklin AMF ¶¶ 38-39).  Plaintiffs also

had independent authority to authorize payments of temporary disability benefits which required verifying the applicant's income, determining when the claimant become disabled, and obtaining medical evidence that the applicant was fit for work again. (Burton AMF ¶ 36; Bucklin AMF ¶ 51).

Next, Plaintiffs had unfettered authority to set reserves up to $100,000 based on their estimate of the probable payout on the claim. (Burton AMF ¶ 19; Bucklin AMF ¶ 27).  In calculating reserves, Plaintiffs weighed a number of factors, including cost of treatment, length of temporary disability, likelihood of permanent disability, prior injuries, and how claims would likely unfold at settlement or trial.  (Burton AMF ¶ 21; Bucklin AMF ¶ 29).

Approximately 80 percent of the claims Burton handled, and 50-60 percent of the claims Bucklin handled were eventually litigated. (Burton AMF ¶ 37; Bucklin AMF ¶ 52).  When claims were litigated, Plaintiffs decided whether to retain an outside attorney and if so whom, developed a litigation strategy with the attorney, and supervised the litigation.  In overseeing the litigation, Plaintiffs decided whether to conduct discovery, to depose the claimant, to seek expert opinions, to conduct settlement negotiations, or to take a case to trial.  Indeed, the attorneys defending these claims could not take any of the foregoing actions without first obtaining the Plaintiffs' authorization.  (Burton AMF ¶¶ 38-40; Bucklin AMF ¶¶ 53-54).  If Plaintiffs later decided that settlement was appropriate based on their evaluation of the costs and benefits of going forward, they calculated the appropriate settlement amount and negotiated the settlement, provided it was within their respective personal authority limits of

$75,000 (Burton) and $80,000 (Bucklin).  (Burton AMF ¶¶ 46, 54; Bucklin ¶¶ 66-68).  If the settlement amount exceeded their authority limit, Plaintiffs submitted a recommendation explaining their rationale to their supervisors; these recommended settlements were almost always approved.  (Burton AMF ¶¶ 58-59; Bucklin AMF ¶ 69).  Finally, Plaintiffs also independently resolved the claims of lien holders by choosing either to settle the claims, which entailed valuing the claims and determining the settlement amount, or by taking the lien claims to trial.  (Burton AMF ¶¶ 49-51; Bucklin AMF ¶¶ 71-73).

Undeterred by the foregoing evidence, Plaintiffs insist that they did not exercise discretion or independent judgment because (1) their actions were "severely restricted" by procedures set forth in Defendant's Best Practices, Defendant's pre-formatted macros, the insured's special handling instructions, and the California Labor Code; and (2) they were closely supervised to ensure that they were adhering to those standards.  (Burton Opp. at 20-21; Bucklin Opp. at 20-21).  Upon closer scrutiny, however, the cited procedures and purported oversight were not so exhaustive as to obviate the need to exercise discretion and judgment regarding significant matters.[14]

### i.  Best Practices

Plaintiffs argue that Defendant's Best Practices provided "well-established techniques and procedures within closely prescribed limits

---

[14] The Court only considers evidence specifically identified in Plaintiffs' opposition papers.  "A party opposing summary judgment *must direct* our attention to specific, triable facts."  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003) (emphasis added); see also Forsberg v. Pac. Northwest Bell Tel. Co., 840 F.2d 1409, 1418 (9th Cir. 1988) ("The district judge is not required to comb the record to find some reason to deny a motion for summary judgment.").

that Plaintiff[s] [were] required to use to determine the correct response to any inquiry or set of circumstances." (Burton AMF ¶ 107; Bucklin AMF ¶ 126). These limits, however, were not as "closely prescribed" as Plaintiffs portray them to be. For example, although the Best Practices set deadlines for when Plaintiffs needed to take action (i.e., make initial contacts, determine coverage, document a compensability decision, set reserves, send Acknowledgment and Closing notices, and refer files to attorneys), these deadlines did not nullify the need for Plaintiffs to exercise discretion and judgment in making these decisions. (Burton AMF ¶¶ 108, 110, 113-15, 119; Bucklin AMF ¶¶ 127, 129, 132-34, 138). In addition, Plaintiffs seize on the fact that the Best Practices manual highlights certain "triggers" for denial of coverage, and requires claims adjusters to notify certain individuals in the event of such denial. (Burton AMF ¶¶ 111-12; Bucklin AMF ¶¶ 131-32). However, none of this evidence alters the fact that, when faced with a case not involving a clear-cut denial, Plaintiffs needed to exercise their judgment at every subsequent step, including coverage, reserves, settlement, and litigation.

On the contrary, the Best Practices manual explicitly envisions that Plaintiffs would exercise judgment in completing their tasks. For example, the section of "Initial Contacts" states that "[i]f the Claim Professional determines that employee contact is not necessary, the rationale for this decision must be documented in Z-Notes." (Bhowmik Decl, Ex. 3 at 10). Similarly, the chapter on "Information Gathering" advises that the "Claim Professionals need to use their best judgment as to whether a recorded statement is needed from the employer's supervisor/foreman," as well as from other witnesses. (Id. at 12-13).

Further, the document states that "[a]t each stage of the case, the Claim Professional must continually reevaluate whether the time is right for settlement of those cases that can and should be settled." (Id. at 23).  And when settlement is not an option, the manual provides that "[t]he Claim Professional has the ultimate responsibility for the maintenance and control of all litigation activities." (Id. at 24). In short, the Best Practices manual does not controvert, but rather reinforces the substantial evidence that Plaintiffs exercised discretion and judgment on matters of significance.

### ii.   Preformatted Macros

As additional evidence that their actions were severely restricted, Plaintiffs argue that they were obligated to answer questions generated by "preformatted macros" during the handling of a claim.  (Burton Opp. at 6; Bucklin Opp. at 6).  These macros generated several stock questions that guided four specific avenues of Plaintiffs' investigation: initial contacts (5-6 questions); confirmation of coverage (5 questions)[15]; benefits notices (4 questions)[16]; and subrogation potential (3 questions)[17].  (See Burton AMF ¶ 109; Bucklin AMF ¶ 128).

---

[15] The five questions concern whether the date of injury was within the policy period, the location is listed on the policy, there was a review of endorsements on the policy, the state listed is covered, and claimant is verified to be an employee of the insured.  (Klicker Depo. at 16-17).

[16] The four questions concern the first day of disability, the average weekly wage, the temporary disability rate, and the date on which the check would be issued.  (Klicker Depo. at 19).

[17] The three questions concern whether there is subrogation potential, who the responsible party is, and whether to make a referral to subrogation department.  (Klicker Depo. at 21).

29

As an initial matter, Plaintiffs' own evidence shows that these macros left significant room for independent judgment.  For instance, in his deposition, Bucklin's supervisor, Alberto Rodriguez, described the "initial contacts" macro as "a set of questions or a set of items that they need to cover, but . . . it's just a guideline." (Bhowmik Decl. Ex. 7 at 36).  He explained that "depending on the type of injury that is involved, then they [the claims adjusters] need to **free form** exactly how their investigation goes or added questions that need to be addressed." (Id.) (emphasis added).  Further, Burton's supervisor, Patrick Klicker, attested that the initial contact macro contained only "five to six questions." (Bhowmik Decl. Ex. 8 at 20).  With respect to the "subrogation" questions, Rodriguez explained that "it's a couple of questions.  One, is there a subrogation potential?  And, two, was it referred to the recovery unit?  And the adjuster will free form notes in there for the subrogation folks to look at." (Bhowmik Decl. Ex. 7 at 43).[18]  Plaintiffs' supervisors' discussion of the preformatted macros indicate that Plaintiffs were required to exercise independent judgment and discretion in their investigation—to "free form"—depending on the facts of the specific claim, and to independently evaluate such issues as subrogation potential, for which the preformatted questions were limited in number and lacking in specificity.  Thus, Plaintiffs' own evidence shows that these preformatted macros did not overcome the need for Plaintiffs to exercise judgment and discretion.

Moreover, and in any event, the preformatted macros were essentially glorified checklists that reminded Plaintiff to ascertain

---

[18] Klicker gave a similar description of the subrogation questions. (Bhowmik Decl. Ex. 8 at 21).

certain facts with respect to four limited subject areas: initial

contacts, confirmation of coverage, disability benefits, and

subrogation.  As such, these macros did not—indeed, could

not—predetermine how Plaintiffs should analyze the facts to make

significant decisions such as determining coverage, setting reserves,

negotiating settlement, or supervising litigation.  Accordingly, these

macros did not eliminate the need for judgment and discretion.

The Court's conclusion comports with the Ninth Circuit's decision

in Farmers.  There, the court concluded that auto claims adjusters were

administratively exempt even though the employer provided them with

"written guidelines and training materials to aid them in the claims

handling process" that included some mandatory procedures and some

recommendations.  481 F.3d at 1125.  Further, the court reached this

conclusion even though the claims adjusters used computer software to

help estimate damage or loss.  Id. at 1130-31.  The court reasoned that

"while software exists for estimating the value of totaled vehicles, an

automobile damage adjuster 'must use good judgment' in deciding whether

it is the 'best tool' for a total loss."  Id.  Accordingly, the Court

concluded that "the use of computer software to estimate claims does

not eliminate the need for discretion and judgment any more than does

resort to other reference works or to the opinions of appraisers and

other experts."  Id. at 1130-31 (citing Cheatham, 465 F.3d at 585

(rejecting argument that adjusters "are limited in their ability to

negotiate by having to adhere to computer software," and holding that

consulting manuals or guidelines "does not preclude their exercise of

discretion and independent judgment")).  Similarly here, the fact that

Plaintiffs answered a few computer-generated questions in four limited

subjects does not alter the fact that Plaintiffs made significant independent decisions in other respects, including determining coverage, setting reserves, negotiating settlement, and stewarding litigation.

### iii. Special Handling Instructions

Plaintiffs next argue that their conduct was constrained by the insured's special handling instructions. (Burton AMF ¶ 121; Bucklin AMF ¶ 140).  The only evidence cited in support of this contention is Defendant's Quick Reference Guide, which states that "[a]dherence to all Special Handling Instructions must be timely, with compliance documented in Z-Notes and/or the file." (Bhowmik Decl., Ex. 11 at 3).  This vague assertion is wholly insufficient to controvert the overwhelming evidence that Plaintiffs exercised discretion and judgment in handling claims.  Moreover, it is undisputed that when Plaintiffs needed an insured's approval before taking action, Plaintiffs would submit reasoned recommendations to the insured, and the insured almost always accepted Plaintiffs' recommendation.  (Burton AMF ¶¶ 61-63; Bucklin AMF ¶¶ 19, 26, 37).  Accordingly, this argument fails.

### iv. California Labor Code

Plaintiffs contend that the California Labor Code also restricted their activities.  While it is true that the labor laws mandate certain deadlines and generally require that a denial of coverage must be based on a medical, legal, or factual basis, none of this evidence controverts the fact that Plaintiffs were required to *apply* California labor law to the specific facts of each case to resolve their claims.  Plaintiffs have presented no evidence that their task of *applying* the law to the facts was devoid of independent judgment or discretion.

1  Therefore, this argument fails.

2                    v.   Supervision

3       Finally, Plaintiffs argue that they did not exercise independent

4  judgment because their work was never "free from immediate direction or

5  supervision."  29 C.F.R. § 541.207(a) (2000).  Federal regulations

6  explain, however, that the term "discretion and independent judgment"

7  does not necessarily imply that an employee's decisions "must have a

8  finality that goes with unlimited authority and a complete absence of

9  review."  29 C.F.R. § 541.207(e)(1) (2000).  "The decisions made as a

10 result of the exercise of discretion and independent judgment may

11 consist of recommendations for action rather than the actual taking of

12 action.  The fact that an employee's decision may be subject to review

13 and that upon occasion the decisions are revised or reversed after

14 review does not mean that the employee is not exercising discretion and

15 independent judgment . . . ."  Id.

16      Although Plaintiffs have adduced evidence that their supervisors

17 exerted some oversight over their tasks, it did not eliminate the

18 substantial independence Plaintiffs otherwise enjoyed.  To be sure,

19 certain decisions required prior supervisory approval, including

20 denials of claims, hiring a private investigator, setting reserves or

21 entering a settlement above personal authority limits, and referring

22 claims to the subrogation or fraud units.  (Burton AMF ¶¶ 55-59, 134,

23 135, 145; Bucklin AMF ¶¶ 35, 43, 69, 153, 155, 163).  Nonetheless, it

24 is undisputed that even where such decisions required pre-approval,

25 Plaintiffs were expected to offer a reasoned recommendation for the

26 action, which was accepted the vast majority of the time.  (Burton AMF

27 ¶¶ 58-63; Bucklin AMF ¶¶ 25-26, 35-36, 69).  These recommendations show

28

that Plaintiffs exercised discretion and independent judgment.  29 C.F.R. §541.207(e)(1).  Moreover, the decisions requiring pre-approval do not negate the myriad other decisions over which Plaintiffs enjoyed absolute authority, including granting coverage, setting reserves or negotiating settlements within their personal authority limits, managing litigation, and resolving lien claims.  Thus, the foregoing evidence fails to create a triable issue that Plaintiffs did not exercise independent judgment.

Plaintiffs next argue that they lacked independent discretion because their supervisors periodically monitored and audited Plaintiffs' work.  For instance, supervisors performed 12-day, 30-day, 60-day, and 180-day reviews to ensure that Plaintiffs had completed certain tasks in a timely manner and to review Plaintiffs' answers to the preformatted macro questions.  (Burton AMF ¶¶ 138-40, 143; Bucklin AMF ¶¶ 157-59, 161).  Additionally, supervisors entered "diaries" to ensure that Plaintiffs were completing specific tasks to move the claim process along.  (Burton AMF ¶¶ 141-42; Bucklin AMF ¶¶ 160-61).  Supervisors also generated reports monitoring Plaintiffs' productivity.  (Burton AMF ¶ 147; Bucklin AMF ¶ 165).  For the most part, however, the supervisors were concerned with whether Plaintiffs were following protocols and documenting their reasons for each decision, not with dissecting the substantive decisions made.  (Rodriguez Decl. ¶ 18; Klicker Decl. ¶ 17).  Indeed, Plaintiffs' supervisors testified that they "typically limited [their] reviews to no more than 10 minutes, which did not allow [them] to review all of the evidence relevant to each claim or to evaluate whether [they] agreed with all of the determinations [Plaintiffs] had made based on that evidence."

(Rodriguez Decl. ¶ 18; Klicker Decl. ¶ 17).  Further, although the supervisors checked the adequacy of the reserves set and any subsequent calculation of benefits, this does not alter the fact that Plaintiffs had to exercise discretion and judgment in calculating those figures in the first place.  These periodic reviews, therefore, do not suggest that Plaintiffs lacked discretion.

Moreover, while it is true that supervisors performed quarterly audits to assess how well Plaintiffs adhered to Defendant's Best Practices, such evidence carries minimal weight for two reasons. First, as already discussed, the Best Practices themselves delegate authority to adjusters to exercise judgment in handling claims.  Thus, the mere fact that supervisors reviewed whether adjusters were "adhering" to Best Practices does not change the fact that adjusters exercised discretion and judgment.  Second, it is undisputed that these audits were both infrequent and limited in scope.  Supervisors only audited four files per quarter— two on open claims and two on closed claims—even though Plaintiffs each carried more than 100 cases at any given time.  (Burton AMF ¶ 66; Bucklin AMF ¶ 81).  There is no hint that any of these audits resulted in a reversal of Plaintiffs' recommendations.  Therefore, this evidence is insufficient to create a triable issue of fact that Plaintiffs did not exercise discretion and independent judgment.

                              *    *    *

To summarize, the Court concludes that Plaintiffs exercised discretion and independent judgment in the course of investigating claims, setting reserves, determining coverage, handling temporarily disability payments, resolving liens, identifying potential for fraud

or subrogation, negotiating settlement, and managing litigation. Further, it is undisputed that Plaintiffs spent at least 40 percent of their work week performing the foregoing duties. (Burton AMF ¶ 74; Bucklin AMF ¶ 87). This suffices to meet the "customarily and regularly" threshold, which means "greater than occasional" but may be "less than constant." 29 C.F.R. § 541.207(g) (2000). Accordingly, the Court concludes that there is no genuine dispute of material fact and that Defendant has proven that Plaintiffs "customarily and regularly" exercised discretion and independent judgment within the meaning of Wage Order 4-2001. See 8 Cal. Code Regs. § 11040(1)(A)(2)(b).[19]

    3.   Remaining Elements

The two remaining components of the administrative exemption test are that the employee must perform "under only general supervision work

---

[19] After the close of briefing, Plaintiffs cited a new case to support its contention that Plaintiffs are not administratively exempt. See Gentile v. Keenan & Assocs., No. BC471005 (Los Angeles Super. Ct. May 28, 2013). Leaving aside for the moment that Gentile is an unpublished, non-binding opinion, the case also lacks persuasive force because it is distinguishable. First, the court erroneously applied the same invented standard in Harris II that work must "operate[] on the policy level" to be administrative in character. (Dkt. 134 at 13). With respect to the quantitative prong, the court detected a factual dispute about whether plaintiff had any final authority to settle claims and set reserves. (Id. at 14). Here, by contrast, it is undisputed that Plaintiffs had absolute authority to settle claims and set reserves up to their personal authority limits, and provided reasoned recommendations where the requested amounts exceeded the limits. Second, the court found a triable issue whether the claims adjusters exercised discretion and independent judgment, citing (1) the absence of evidence that they had discretion to determine coverage, conduct investigations, determine liabilities, and negotiate and authorize settlements; and (2) the contrary evidence that the adjusters needed pre-approval to accomplish any of the foregoing tasks. (Id. at 15). Here, however, the uncontroverted facts prove that Plaintiffs performed such functions without prior approval. For all these reasons, Gentile does not compel a different conclusion in this case.

along specialized or technical lines requiring special training, experience, or knowledge," and must be "primarily engaged in duties that meet the test of the exemption."  8 Cal. Code Regs. §§ 11040(1)(A)(2)(d), (f).

The first element is clearly satisfied.  For the same reasons discussed in Subsection IV(A)(2)(v), Plaintiffs were subject to "general supervision" that did not curtail the need for Plaintiffs to exercise discretion and judgment.  Moreover, given Plaintiffs' position that they were subject to overriding supervision, they cannot and do not now dispute that they were, at a minimum, subject to general supervision.

Nor do Plaintiffs take issue with the fact that their work required special training, experience, and knowledge.  Burton had seventeen years of prior experience before becoming employed by Defendant, she completed the required thirty hours of continuing education in claims handling every two years, and she obtained a "self-insured certificate" from the State of California.  (Burton SUF ¶¶ 5-7).  When Bucklin began her employment with Defendant, she had more than twenty years of workers' compensation claims adjustment experience, completed the required continuing education in claims handling, and held a certification in claims adjusting from the Insurance Educational Association.  (Bucklin SUF ¶¶ 5-7).  The job description for Plaintiffs' position, Claims Specialist III, required, among other qualifications, "in-depth knowledge of the insurance industry, claims, and the insurance legal and regulatory environment." (Burton AMF ¶ 8; Bucklin AMF ¶ 8).  It is undisputed that Plaintiffs relied on their experience and knowledge in making decisions related to

adjusting claims.  (Burton AMF ¶ 10; Bucklin AMF ¶ 23); (Burton Opp. at 22 ("Plaintiff agrees that her position requires the exercise of skills and knowledge."); Bucklin Opp. at 22 (same)).  Thus, Plaintiffs have demonstrated beyond dispute that they worked "under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge."

Next, Plaintiffs do not point to sufficient facts to dispute that they were "primarily" engaged in exempt duties, which means more than one-half of their work time.  See Cal. Lab. Code § 515(e); 8 Cal. Code Regs. § 11040(2)(N).  For purposes of this calculation, exempt work includes "all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions."  8 Cal. Code Regs. § 11040(1)(A)(2)(f).  Here, Bucklin concedes that she spent more than half of her work week engaged in exempt activities described above, including conducting investigations, determining coverage and compensability, identifying subrogation opportunities, setting reserves, obtaining medical evidence, managing litigation, and negotiating settlements, among other similar duties. (Bucklin AMF ¶ 87).  Thus Bucklin satisfies the "primarily engaged" requirement.

Burton agrees that she devoted 40 percent of her work week to the same exempt duties.  (Burton AMF ¶ 74).  Further, it is undisputed that Burton devoted the other 60 percent of the work week to directly related tasks, including inputting the reserves she had determined into the computer, documenting her plan of action and developments regarding the claim, summarizing deposition testimony, handling correspondence, reviewing medical and legal bills for payment, and preparing

correspondence to claimants to inform them of the status of their claims and her decisions. (Id. ¶ 75). These tasks are properly categorized as "work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions," to which the administrative exemption also applies. 8 Cal. Code Regs. § 11040(1)(A)(2)(f). Burton therefore also satisfies the "primarily engaged" prong.

For the foregoing reasons, there is no triable issue that precludes the entry of summary judgment. In reviewing the undisputed facts, the Court concludes that Plaintiffs' duties satisfy each of the requirements for administrative exemption under Wage Order 4-2001, and therefore Defendant properly classified Plaintiffs as exempt.

**B.   Remaining Claims**

Plaintiffs do not dispute that their claims for overtime, meal and rest breaks, accurate wage statements, and wage penalties are dependent on their being classified as non-exempt under Wage Order 4-2001. Because Plaintiffs were properly classified as administratively exempt, these claims fail as a matter of law and the Court need not address them further.

//

//

//

//

//

//

//

//

**V.    CONCLUSION**

For the foregoing reasons, Defendant's motions for summary judgment are GRANTED, and Plaintiffs' subsequently filed motion for class certification is DENIED as MOOT.   IT IS ORDERED AND ADJUDGED that Burton and Bucklin take nothing, that the actions by Burton and Bucklin against Defendant Zurich be dismissed on the merits with prejudice and that Zurich recover its costs.


IT IS SO ORDERED.


DATED: <u>June 19, 2013</u>                    _____

                                            STEPHEN V. WILSON

                                     UNITED STATES DISTRICT JUDGE